## Fox v. Commonwealth.

Jan. 30, 1945.

J. Edward Boltz, Daniel W. Davies, and A. J. Slaughter for appellant.

Eldon S. Dummit, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HARRIS—Affirming.

The appellant was convicted of committing rape on Myrtle Barnes, a white girl, and his punishment fixed at death. The crime and its circumstances were most revolting, so much so that details would be omitted if it were not for the severity of the punishment which the jury in its discretion has seen fit to inflict.

Miss Barnes, who lived in Jackson, Kentucky, and was a member of the high school there, was visiting her sister in Newport, Kentucky. On the night of August 23, 1943, she was in one of the parks there at Newport in company with her young gentleman friend, Stanley

Fryman, when the following occurred, as testified to by her:

"Q. What did you do when you went to the park that morning? A. We walked through the park and sat on a bench and we were sitting there and talking. Four negroes came across the path; they came behind us. They came behind the bench where we sat. There was a tree behind it. They came around the tree and came around in front of the bench where we sat. One of them asked Stanley for a match. Stanley started to get up to see if he had a match. One of them shoved him back on the bench. I started running. I was running out of the park and three of them caught me.

"Q. After they got you what did they do? A. They threw me over in the weeds of the bank.

"Q. Then what happened? A. They beat me. They beat me with their fists. They cut my underclothes off.

"Q. They cut your underclothing off with what? A. With a knife.

"Q. What part of your underclothing did they cut off? A. They cut my panties off.

"Q. What part of your body did they beat? A. My face.

"Q. What is it they used to beat your face? A. Their fists.

"Q. Was there any blood flowing from your face? A. Yes; I had blood all over me.

"Q. After they had beaten you with their fists, what did they do further? A. One of them got on top of me and had intercourse with me. He got off, and that one over there (indicating the defendant Fox) got on.

"Q. How many of them were there at the time? A. There were two over the bank with me, and one standing on the bank watching for them.

"Q. Who were the two over the bank with you? A. That one, and Ed Hambrick.

"Q. What is that fellow's name? A. Carl Fox.

"Q. What did he do when he got on top of your? A. He had intercourse with me.

"Q. What do you mean when you say 'intercourse?' A. He put his sex organ—into my vagina. He was sucking my breast.

"Q. When you say that he put his sex organ into your vagina, I want you to tell how much of a penetration was that, if you know? A. (after a long pause) I could just feel it.

"Q. Who was first on top of you and had intercourse with you? A. Hambrick.

"Q. Will you state whether or not there was a discharge from Hambrick while he was on you and into you? A. Yes.

"Q. Who came after him? Who was on top of you after him? A. Carl Fox.

"Q. After Fox got off you, what happened? A. Hambrick got back on me again. Fox was trying to put his penis in my mouth.

"Q. Who had that knife that was used for cutting off your pants? A. Hambrick. * * *

"Q. I will show you this garment, and ask you what it is? A. The blouse I had on.

"Q. I will call your attention to these spots on this blouse, and ask you what they are. A. Blood from my mouth. * * *

"Q. After the evening or the morning when this occurred, what was the condition of your body the following day? A. I was bruised; I was sore. My mouth and my face was all swollen up.

"Q. Can you tell the jury where these bruises on your body were. A. On my legs and my arms; my breast and my hips.

"Q. When the police came up, what was the condition of your clothing, if you know? A. My blouse was unbuttoned. My slip was torn down the front. I had blood all over me. I didn't have any shoes on. I lost them. * * *

"Q. Hambrick was on you first. What was Fox doing while Hambrick was on you? A. Holding me down. Telling me to shut up. If I didn't he was going to cut my head off. He was holding a knife to my throat.

"Q. You have testified that Hambrick was on you twice? A. Yes.

"Q. The time that Fox tried to put his penis into your mouth, was that while Hambrick was on you the first time or the second time? A. The first time."

Miss Barnes was supported in her statements by the testimony of Stanley Fryman, John Reed, and Paul Krebs, from which we take the following:

Stanley Fryman:

"A. There were four colored boys approached us from the back. One of them walked around to the right of me and asked me if I had a match. I said I didn't know whether I did or not and I started to raise up and see whether I had a match and I saw two others come on the left of me. One of them grabbed me by the back. Miss Barnes screamed first. We started to run. One of them grabbed me by the back. I jerked loose and fell to my knees. I jumped up and ran—both of us, down through the corner of the park. Three of them ran after her, and one after me.

"Q. In what direction did you and Miss Barnes run? A. We ran across the corner of the park.

"Q. Towards what? A. The Ohio river.

"Q. Who was it that caught you? A. William Stutson.

"Q. At the time you were caught did you see what happened to Miss Barnes? A. Yes, sir, I did.

"Q. What happened to her that you know of? A. That I know of—she was caught by three colored boys. She was dragged over the bank of the river. That is all I saw.

"Q. In the meantime, what happened to you? A. The one that grabbed me told me to put my hands up and start marching.

"Q. What did you do when he told you to put up your hands? A. He had his hand in his coat pocket. I didn't know whether he had a gun or a knife. He told me to put my hands up, with his hand in his coat pocket, and he told me to turn around and start marching. I told him if he wanted my money he could take it. He told me to keep my hands up.

"Q. What did he say when you asked him if he wanted your money? A. He told me to keep my hands

up and that he didn't want money—wanted the girl—and to start marching—he told me to turn around and start marching. He marched me back toward the Licking River; he marched me past a tree about ten feet; he told me to turn around with my hands up and start marching toward the tree. I put my hands up and went past the tree. Then I hit him in the jaw and knocked him down and came for the police. I came to the Court House and went in the station and I told the officer what was the matter; and about that time the police car drove up and they got out and started to the Court House and he hollered out the window and told them what was the matter. He told me to run to the police car and show them where she was at. I went with the police to the park. When we got in the park I showed them where to go. We drove down in the park and one of them got out and went to the left. I told them where I had last seen her. We went where I had seen Miss Barnes. I called her name. I heard a groan or scream—something like that. We started to where we heard the sound. Two colored boys jumped up and came out of the weeds.

"Q. Which two colored boys jumped up and came out of the weeds? A. Carl Fox and Ed Hambrick.

"Q. Is Carl Fox in the room here? A. Yes, sir.

"Q. Point him out. A. There he is (indicating the defendant Fox.)

"Q. Tell the jury whether or not he was one of the four negroes you said came up to you while you were on the park bench with Miss Barnes. A. Yes, sir; he was. He was one of them."

John Reed:

"Q. What is your occupation? A. Patrolman for the City of Newport. * * *

"Q. Did you go to City Park? A. Yes, sir.

"Q. With whom did you go? A. Officer Krebs and Stanley Fryman. * * *

"Q. Did you at any time get out of the car? A. Yes, I was out of the car. I got out of the car and pulled up there and this girl was screaming and hollering. She was hysterical.

"Q. What, if anything, did she say when she came

up to you, Fryman and Krebs? A. I asked what they had done. She said, 'Everything except kill me.'

"Q. What was the condition of her clothing? A. It was torn. The buttons was off of her waist. She had a skirt on, and a waist.

"Q. Did she have any shoes on? A. No, she didn't have any shoes on. I found one shoe later on—

"Q. Where? A. We found one shoe about twenty feet from the spot where they came out of the weeds. The other shoe was found about five feet away. Her pants were hanging on a little tree.

"Q. With reference to her blouse, can you tell whether there were any stains on her blouse? A. It was covered with blood specks.

"Q. What was the condition of her face? A. It was bruised. Her nose had been bleeding. Her eyes were swollen and I believe the left side of her face. She had apparently been hit. * * *

"Q. You didn't have any other conversation with her after you were on the way to the hospital? A. The Lieutenant and I were both talking to her but it didn't make much sense. She was too unstrung.

"Q. She was incoherent? A. She was screaming and crying."

Paul Krebs:

"Q. What is your employment? A. City patrolman. * * *

"Q. What was the condition of the girl's clothing when she got up? A. Her blouse was full of blood. * * *

"What was the condition of Fox's shirt? A. He had blood on the front of it. He was wearing a white shirt splattered with blood.

"Q. What was the condition of Hambrick's shirt? A. There was blood on the front of it, too."

The appellant offered no testimony on the merits of the case except his own. As shown by the record, his version of the nature and extent of his participation in the assault and rape is this:

"Q. Did you see this young lady, Myrtle Barnes,

and Stanley Fryman in the Park? A. I seen a boy and a girl. I didn't know it was them right then.

"Q. You did see a boy and girl there? A. Yes, sir.

"Q. Tell what happened right after that. A. McCall and Stutson walked up to the bench while me and Lewis were walking up there. The girl jumped up and started running toward Riverside Drive. Stutson stood with the boy. The boy didn't go nowhere. McCall started to run after the girl. He caught the girl before she got out of the park. Lewis and myself walked toward where they was at. McCall slapped—he didn't slap her then. He took her over to the river bank. Lewis and myself walked up there where he was at. We got up to where he had her. McCall slapped the girl. He took her on the side down a little bit toward the bank. Lewis, he left about that time. He left. Hambrick came over there. McCall had the girl down, and he had straddled her. I was standing close to the girl and saw McCall on her. Hambrick came over and said something to McCall. I had the girl by the arms. About that time Hambrick came over and said something. He said something to McCall; I couldn't understand what they were saying. McCall got up off the girl. The girl was crying. She was hysterical. He got up from the girl and went over the bank. That left Hambrick and myself there. Hambrick was talking to the girl, saying something. I wasn't paying much attention. I was standing off the bank. About that time a light was flashing through the weeds. I went out. Hambrick came after.

"Q. You were the first one out of the weeds when the police came? A. Yes, sir, I was. * * *

"Q. Did you make any effort or attempt to have intercourse with her. A. I made a slight entrance but I didn't have no intercourse with her.

"Q. McCall was the first one that had intercourse with her? A. yes, sir.

"Q. Hambrick was next? A. Yes, sir.

"Q. Then what happened? A. I tried; they pulled me back.

"Q. Who pulled you back? A. Hambrick."

The appellant complains: (1) That the trial court erred in not requiring the Commonwealth to produce in

evidence, or at least to present for inspection, a certain written statement which had been signed by the appellant in the detective's room at the Newport city jail; (2) the court erred in admitting evidence that the prosecuting witness became infected with gonorrhea; (3) that the court erred in compelling him to demonstrate before the jury the position he occupied with relation to the body of the prosecuting witness; (4) that the commonwealth's attorney was guilty of misconduct in his argument; (5) that the court erred in not instructing the jury upon the whole law of the case; (6) that the verdict is not supported by the evidence and is so flagrantly against the weight of the evidence as to indicate that it was reached as a result of passion and prejudice. We shall consider these complaints in their order.

First. At police headquarters, some few days following his arrest, the appellant made certain statements which were reduced to writing and signed by him. Upon the trial, it was shown that portions of appellant's testimony were inconsistent with the statements which he had made at the police station. Counsel for appellant objected to that evidence unless the court required the Commonwealth to introduce the writing and gave him and his client an opportunity to inspect it. The court overruled the objection. On the authority of section 598 of the Civil Code of Practice and of Meadors v. Commonwealth, 281 Ky. 622, 136 S. W. 2d 1066, cited by appellant, this was error. It is our further opinion, however, that in view of the nature of the contradictory statements and their relationship to the other testimony in the case, the error was not prejudicial or of sufficient gravity to entitle the appellant to a new trial.

Second. This complaint is without merit. The Commonwealth was not. required to confine its testimony to any single part of the assault complained of. It had the right to prove everything that occurred in connection therewith, and this included Ed Hambrick's rape of the prosecutrix. Shively v. Commonwealth, 227 Ky. 748, 14 S. W. 2d 205. Shortly following the appellant's arrest, he was examined by a physician and found to be free from gonorrhea. The appellant argues that because the evidence establishes that he did not have gonorrhea himself it was incompetent and prejudicial for the court to permit the prosecuting witness to show that she became infected with that disease. In this contention the appellant is in error. It is well settled, and

in his brief the appellant concedes, that testimony of this character is admissible when there is a denial of intercourse by the defendant, if the defendant is infected and the prosecuting witness likewise becomes infected. The theory upon which such evidence is competent is that of corroboration. Since Miss Barnes' testimony was that both Hambrick and the appellant were present and that both participated in the assaults and rapes which were committed upon her, and since the evidence is uncontradicted that Hambrick was infected with gonorrhea at the time, evidence that Miss Barnes became infected with the same disease is corroborative of her story.

Third. The appellant cites no authority which sustains his position. When he took the stand in his own behalf he became a witness for all purposes, and the Commonwealth had the right to examine him as fully and freely as would have been the case had he been merely a witness and not the defendant. And since on direct examination he testified as to the movements of himself and of the others present, as well as to the position of his body with reference to that of Miss Barnes, the Commonwealth had the right, for the purpose of contradiction and for the purpose of testing the reasonableness and truthfulness of his statements, to interrogate him fully. We know of no adjudicated case, certainly there is none in Kentucky, which holds to the contrary.

Fourth. In support of his motion and grounds, the appellant filed the affidavits of himself and the Reverend M. A. Dykes to the effect that the Commonwealth's attorney referred to the appellant as a "filthy rat." In response the Commonwealth filed the affidavits of the Commonwealth's attorney and Ed Hamilton to the effect that what the Commonwealth's attorney said was: "No one but a filthy rat would have perpetrated such a crime upon this girl." So far as the record shows the argument of the Commonwealth's attorney was not reported, and the bill of exceptions is entirely silent as to what he said. As has been repeatedly held, this court looks to the bill of exceptions to determine what took place upon the trial, and there being nothing in the bill of exceptions with respect to what the Commonwealth's attorney said, we are not authorized to weigh the various affidavits filed or to determine the case on the basis of what is said in those affidavits.

Fifth. This complaint is that the court erred in failing to instruct the jury on the common law offense of attempted rape. In his brief, counsel for the appellant says: "The defendant contended strenuously that he did not have intercourse with the prosecutrix, but did intend and attempt to do so." From this he argues that the court was in error in not giving an instruction on the common law offense of attempted rape, a misdemeanor. This argument is without merit. The court gave an instruction on the crime of detaining a woman against her will (KRS 435.110, formerly sec 1158), and that was sufficient. As said by the court in Merriss v. Commonwealth, 287 Ky. 58, 151 S. W. 2d 1030, 1034, "when an instruction is given under section 1158 as to detaining a woman against her will, as was done here, there is no reason or necessity for giving an instruction as to the common-law crime of attempted rape since it is included in and covered by the instruction given under section 1158."

Sixth. In connection with his argument that the verdict is not supported by the evidence, counsel for appellant says: "The issues were so narrowly defined on the questions of fact that we feel that the only real question of fact to be determined was whether the appellant had actually had carnal knowledge of the prosecutrix, in the legal acceptation of the term. In other words, was there a penetration? The writer is mindful of the rule, that if there was penetration, however slight, the act is completed, but we earnestly urge that there was no evidence of such a character that a belief beyond reasonable doubt can be based thereon." Counsel is correct in his statement of the rule, but he is in error in his notion that the Commonwealth's evidence was not sufficient to meet its requirements.

On the whole record it is our opinion that the appellant had a fair trial and that the evidence was sufficient to induce and to sustain the verdict. True, the penalty imposed is extreme, but so was the crime.

Judgment affirmed.

Whole court sitting.