## Cawthorn v. Commonwealth.

Oct. 19, 1945.

Baker & Reams, J. B. Carter, and J. K. Beasley for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

In the late afternoon of August 1, 1944, at a mining

camp in Harlan County the appellant, Tom Cawthorn, shot and killed Dellie Clark. He was later indicted by the grand jury of that county in which he was accused of the crime of murder, and at his trial he was convicted of voluntary manslaughter with attached punishment of confinement in the penitentiary for 21 years.

His motion for a new trial, which the court over-ruled, contained a number of grounds usually relied on in such cases among which were (1) improper cross examination by prosecuting counsel of Annie Lee Cawthorn, appellant's daughter-in-law, who was then living in his home (her husband being absent as a soldier in the army) and who was appellant's only corroborating witness as to part of what occurred at the immediate time of the shooting, and (2) improper and prejudicial conduct of the spectators at the trial assembled in the courthouse who were colored people, and from which we deduce the conclusion that both appellant and his victim were members of that race, although it does not expressly so appear in the record.

The above two grounds are the only ones argued by appellant's counsel in this court as authorizing a reversal of the judgment. The others, under numerous decisions of this court, are, therefore, abandoned, and correctly so, since there is nothing in the record to sustain them, which is also true of the two argued in this court as will later appear.

A brief but substantial statement of the facts is: That appellant and his victim were coal loaders in the mine of the same operator. They each resided in camp houses erected for such laborers and their residences were only twenty or twenty-five feet apart. At the rear corner of the lot upon which residence occupied by deceased was located, next to the one upon which the residence of appellant was located, was an outside lavatory, and at sometime after 5 o'clock p. m. on the fatal day Clark went from his residence to the lavatory in front of which was a pedestrian path which extended over onto the lot occupied by appellant.

Sometime before the occasion of the homicide appellant's daughter-in-law had upon occasions (the frequency of which is not disclosed) visited the family of the Clark's, but some week or more before the fatal

day appellant instructed her to cease her visits to the Clark family because, as she testified, "It wasn't a nice place to go." She communicated that statement to the deceased and his wife which, according to her testimony, enraged Clark to some extent, and she testified he made a threat in which he said, "he was going to cut his (appellant's) G—— d—— throat if he didn't mind his G—— d—— business." She immediately upon the return to the home of appellant informed him of that statement.

Upon his return from work in the late afternoon of the fatal day appellant testified that he went to the rear of his house on the mountainside to feed some pigs, but he carried along with him his 45-caliber pistol with which he said he was intending to shoot some dogs that had been worrying his pigs, although he does not claim that there was any such worrying by the dogs on that particular afternoon. Upon his return from that mission he obtained the necessary vessels from his home and started down the path running in front of the lavatory referred to, still carrying his pistol, to a place where he could obtain some milk, and that as he approached the lavatory the deceased opened the door to make his exit there from and asked him why he had told "G—— d—— lies on me;" whereupon he denied the charge and deceased then grabbed him by one hand with a knife in the other hand at which time he fired the shots resulting in his victim's death. The latter's body was hit three times, but all of the witnesses who saw or heard the shooting state that five shots were fired, and the pistol, after the shooting, was found to contain five empty shells. The corroboration of appellant by his daughter-in-law, who says she was sitting on the back porch of appellant's residence, went only to the extent of what appellant had stated was the beginning of the difficulty, but she did not see or witness the shooting.

Some fifteen feet away from the lavatory the son of deceased and a companion were sawing wood. The son testified that he saw everything that happened, and he was corroborated in a material part of his testimony by his companion. He testified, as did all of the witnesses in the case, that there was nothing to prevent appellant or anyone occupying his premises from a complete view of the lavatory, or from seeing anyone enter it. The witness also testified that he first saw appellant,

after he left his residence on the supposed mission of obtaining milk for his family, standing under a cherry tree by the side of the path and about ten feet, or possibly more, from the lavatory. He was then asked and answered:

"Q. Where was your daddy then? A. He was in the toilet.

"Q. How far back did you see Tom Cawthorn before he got to the toilet? A. I saw him leave the house.

"Q. Where was your daddy at that time? A. He was in the toilet then."

He stated that when his father opened the door to leave the lavatory he asked appellant why he had told "them tales," when appellant answered, "I ain't told no G—— d—— lies on you" and immediately pulled his pistol and shot the deceased. The son immediately went to his father, and closely surrounding neighbors who had heard the shots did likewise, and none of them found any knife at the place where deceased was shot, nor did they find any upon his person—either at the place where he fell or in his house where his body was immediately taken. The son of the deceased also stated that his father had no weapon when he was shot nor did he have hold of appellant or make any move toward him, not even making any threatening demonstration. Appellant left the scene immediately after the shooting, continuing his journey down the path and met with a police officer to whom he surrendered his pistol and told the officer that he expected he had hurt the deceased. This brief rehearsal of the testimony is the substance of that given by the witnesses who testified at the trial.

It is contended by counsel for appellant in arguing ground (1) supra that prosecuting counsel in the cross examination of appellant's daughter-in-law committed reversible error in (a) seeking to obtain from her whether or not there was any undue intimacy between her and appellant, and (b) in asking her whether or not she had signed and sworn to a statement as to what occurred at the time of the shooting to which she answered that she had made such a sworn statement but that she did not read the writing and did not know what it contained, nor did examining counsel read anything from

the writing contradictory to what the witness had testified nor did counsel for defendant ask for permission to examine any such affidavit or statement.

To begin with, none of the testimony so referred to was objected to at the time it was given, nor was there any motion made throughout the trial to exclude from the consideration of the jury any such alleged prejudicial examination. Neither was there any motion made to set aside the swearing of the jury and continue the trial. Therefore, if the testimony objected to were erroneous and prejudicial appellant would not be entitled to avail himself of it, since the practice employed at the trial fails to present the alleged error so as to be considered by us and which is the rule of universal application by this and other courts. However, we are not altogether convinced that the effort on the part of prosecuting counsel to develop the facts sought to be obtained by his cross examination of that witness was irrelevant and prejudicial, since the intimacy sought to be uncovered, if it existed, would constitute a motive for the commission of the crime with which appellant was charged.

Subdivision (b) is attempted to be supported by the case of Meadors v. Com., 281 Ky. 622, 136 S. W. 2d 1066, 1067, but in that case defendant's counsel moved the court to allow them to examine the writing alleged to have been made by the witness which the court overruled, and in upholding the right of counsel to examine such alleged statement by the witness we said: "Throughout the trial, defendant's counsel consistently objected to the introduction of evidence concerning the confession and statements made by the defendant at the three inquisitions." Counsel also moved in that case to exclude the testimony after it had been given, but which the court likewise overruled. In treating of that phase of the case, we also said: "The court overruled the defendant's motion to exclude all of it because the transcripts from which the attorney for the commonwealth had read the questions and answers had not been made a part of the record and had not been exhibited to the defendant's attorneys. Again, when the stenographer was called to testify as to the contradictions, defendant's counsel moved the court that the transcript be produced and that they be permitted to examine it. The court overruled the motion.

Such alleged errors were thus duly presented to this court in a way to entitle us to consider them in that case; whilst in the instant case no such practice was observed. We therefore conclude that alleged error (1) is unavailable to appellant on this appeal even if it should be held as prejudicial to the rights of appellant but which under the circumstances we are of the opinion is untrue.

Ground (2) is only attempted to be supported by the affidavit of appellant upon the hearing of his motion for a new trial, but which was contradicted by the affidavit of prosecuting counsel. In his affidavit appellant said that on occasions during the trial, as well as the argument of counsel, the large portion of colored spectators would engage in laughter and otherwise manifest their approval or disapproval of what had occurred, or what had been said by anyone connected with the trial. One sufficient answer to this argued ground is that, as hereinbefore stated, no objection to such demonstration, if it did occur, was made by defendant or his counsel, nor was there any motion to set aside the swearing of the jury and continue the case. Such reasons alone, under the rule hereinbefore stated, would deprive appellant of the benefits of any such alleged error, even if it were held to be prejudicial. But in addition thereto the fact of such conduct is not manifested to this court by anything appearing in the record to authorize our considering it. The universal rule is that such occurrences happening outside of the record should be made a part of the record by a bill of exceptions certified by the Judge as to the facts relied on as constituting reversible error. The latest case so holding is that of Fox v. Com., 299 Ky. 293, 185 S. W. 2d 394, 399, in which the identical question was presented, i. e., the manifesting of the alleged error of a fact not appearing in the record by affidavits. In disposing of the question, after citing the Meadors case so confidently relied on by appellant's counsel, we said: "As has been repeatedly held, this court looks to the bill of exceptions to determine what took place upon the trial, and there being nothing in the bill of exceptions with respect to what the Commonwealth's attorney said, we are not authorized to weigh the various affidavits filed or to determine the case on the basis of what is said in those affidavits."

Wherefore, for the reasons stated, the judgment is affirmed.